## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

WILDEARTH GUARDIANS,

        Plaintiff,

vs.                                                                    No. CIV 07-1043 JB/ACT

UNITED STATES FOREST SERVICE,

        Defendant,

NEW MEXICO CATTLE GROWERS'
ASSOCIATION, COALITION OF ARIZONA/
NEW MEXICO COUNTIES FOR STABLE
ECONOMIC GROWTH, and NEW MEXICO
FEDERAL LAND COUNCIL,

        Defendant-Intervenors.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Opening Brief: Petition for Review of Agency Action, filed January 12, 2009 (Doc. 55)("Pl. Op. Brief"). The Court held a hearing on July 9, 2009. The primary issues are: (i) whether Defendant United States Forrest Service ("USFS") reasonably approved continued livestock grazing on twenty-six allotments on the Gila National Forest pursuant to Section 339 of the Consolidated Appropriations Act of 2005, P.L. No. 108-447 § 339, which requires that such grazing approvals meeting certain criteria to be categorically excluded from documentation in an environmental assessment or environmental impact statement under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370; and (ii) whether the Court should hold that the USFS violated NEPA if the Court finds that the Administrative Record does not support the agency's continued livestock grazing on one or more

of the twenty-six allotments.  The Court's role is to review the record of the USFS' decision-making process to determine whether the decisions were based on legally relevant factors, and whether the USFS acted arbitrarily and capriciously in making its decisions.  Having reviewed the Administrative Record and considered the parties' arguments in the petition, briefs, and hearing, the Court finds that the USFS acted appropriately and in accordance with the law, and the Court therefore denies Plaintiff WildEarth Guardians' petition.

## FACTUAL BACKGROUND

This case involves the authorization of livestock grazing in the Gila National Forest.  The Gila National Forest, located in southwest New Mexico, was designated a national forest in 1907 and is divided into eight United States Forest Service ranger districts, with overall administration of 3.34 million acres of National Forest lands within Catron, Grant, Sierra, and Hidalgo Counties. See Response Brief of the Defendant Intervenors at 10, filed March 30, 2009 (Doc. 60)("Intervenors Response").  The District Ranger for each ranger district is responsible for issuing decision memoranda each time a grazing permit is granted.

A.    **Important Resources of the Gila National Forest**.

The Gila National Forest is home to several federally protected species, contains world renowned wilderness areas, and lies entirely within the sole recovery area for the Mexican gray wolf.  See Pl. Op. Brief at 1.  The Gila National Forest is also used for the grazing of domestic cattle, as permitted by the USFS in ten-year increments, per the Federal Land Policy and Management Act, 43 U.S.C. § 1752(a).  See Pl. Op. Brief at 1.  Because domestic livestock grazing has the potential to impact the environment, each time the USFS issues a new or renewed livestock grazing permit, NEPA requires the USFS to undertake a thorough environmental analysis as part of its decision-making process.  See id.

## 1.  **Threatened and Endangered Species and Critical Habitat.**

The Gila National Forest is home to, and provides habitat for, at least five species the United States Fish and Wildlife Service ("FWS") list as either threatened or endangered pursuant to the Endangered Species Act, 16 U.S.C. §§ 1531-1544. See Second Amended Complaint for Declaratory and Injunctive Relief ¶ 1, at 1,filed February 4, 2008 (Doc. 16) ("Complaint"); Federal Defendant's Answer to Plaintiffs' Complaint ¶ 1, at 2, filed February 29, 2009 (Doc. 23)("USFS Answer"). Specifically, the Mexican spotted owl, Chiricahua leopard frog, loach minnow, spikedace, and Mexican gray wolf are federally protected threatened and endangered species inhabiting the Gila National Forest. See id. FWS fosters the recovery of threatened and endangered species through recovery plans and protection of critical habitats. See 16 U.S.C. § 1533(f). There are recovery plans in place for these endangered species, which affect management of the Gila National Forest. See, e.g., FWS Recovery Plan for the Mexican Spotted Owl at 26 (1995)("Owl Recovery Plan")("Most current observations of Mexican spotted owls are from the Upper Gila Mountains . . . considered a critical nucleus for the subspecies because of its central location within the owl's range and its seemingly high number of owls.").  Additionally, the Mexican spotted owl, loach minnow, and spikedace have designated critical habitat on the Gila National Forest.  See 69 Fed. Reg. 53182 (2004)(final rule designating critical habitat for Mexican spotted owl); 72 Fed. Reg. 13356 (2007)(final rule designating critical habitat for loach minnow and spikedace).

### a.  **The Mexican Spotted Owl**.

The Mexican spotted owl (*Strix occidentalis lucida*) was listed as a threatened species in 1993.  See 69 Fed. Reg. 53183.  Mexican spotted owl populations in the Gila National Forest fall within the Upper Gila Mountains recovery unit, which contains the largest known number of Mexican spotted owls and constitutes approximately fifty-five percent of the known spotted-owl

territories.  See Owl Recovery Plan at 100.  While the Owl Recovery Plan lists the primary threats to the owls in this area to be timber harvest and catastrophic fire, other threats include indiscriminate fuelwood cutting and overgrazing by livestock.  See id.  "Overgrazing is suspected to be detrimental in some areas and can affect both habitat structure and the prey base."  Id. at 101.

**b.      The Chiricahua Leopard Frog**.

The Chiricahua leopard frog (*Rana chiricahuensis*) was listed as a threatened species in 2002, see 67 Fed. Reg. 40790, and a recovery plan was issued in 2007, see 72 Fed. Reg. 30820. Survey research of the Chiricahua leopard frog suggests "the wilderness areas of the Gila National Forest have the greatest potential for supporting additional extant populations and for securing an intact metapopulation that would have a good chance of long-term persistence."  67 Fed. Reg. 40792.  Adverse effects to the Chiricahua leopard frog and its habitat as a result of livestock grazing may occur under certain circumstances.  See AR-01781.  The effects of livestock grazing on the leopard frog population, however, is not well-studied, see AR-02989, and though it is suggested that trampling of Chiricahua leopard frogs by cattle may be occurring, it has not been documented, see AR-02991.

**c.      The Loach Minnow and the Spikedace.**

The loach minnow and spikedace are small fish found in fast-flowing streams.  See AR-02507 & AR-2557.  Both species can be found in the Gila River.  See id.  The loach minnow and spikedace were listed as threatened species in 1986.  See 51 Fed. Reg. 39468 & 51 Fed. Reg. 23769. Their habitats have been impacted to varying degrees by domestic livestock grazing, mining, agriculture, timber harvest, and other development.  See AR-02562.

**d.      The Mexican Gray Wolf**.

The Mexican gray wolf (*Canis lupus baileyi*), or "lobo," is the smallest, rarest, and most

genetically distinct subspecies of gray wolf (*Canis lupus*).  See Complaint ¶ 61, at 25.  Although once numbering in the thousands across much of New Mexico, Arizona, Texas, and northern Mexico, federal eradication efforts undertaken to benefit the livestock indirectly drove the subspecies to near extinction.  See id.  See also 63 Fed. Reg. 1752 (1998), AR-02424.

In 1998, the FWS introduced an "experimental non-essential" ("ENE") population of the Mexican gray wolf in the Blue Range Wolf Recovery Area ("BRWRA") in Arizona and New Mexico.  See Administrative Record at AR-2424.[1]  The BRWRA includes the entirety of the Gila National Forest.  See id.  There are no known wild populations of the Mexican gray wolf that exist in the BRWRA, thus all of the wolves present in the Gila National Forest region are part of the ENE population.  See id.  According to the Administrative Record, FWS "does not intend to change the 'nonessential experimental' designation to 'essential experimental,' 'threatened,' or 'endangered' and foresees no likely situation which would result in such changes."  Administrative Report at AR-02443.  Further, unlike the critical habitats established for threatened or endangered species, like the Mexican spotted owl or the loach minnow, "critical habitat cannot be designated under the nonessential experimental classification" of the Mexican gray wolves.  Id.

As part of the recovery program, the FWS and the USFS are permitted to temporarily restrict human access and "disturbance-causing land use activities" within a one-mile radius around release pens where wolves are, and around active dens and active rendezvous sites for certain time periods.

---

[1] The term "experimental, non-essential" does not mean that the Mexican gray wolf is not near extinction, and it does not mean the reintroduction is just an experiment. 63 Fed. Reg. 1752, 1757, AR-0242. Under Section 10(j) of the Endangered Species Act, an "experimental" population is any population authorized by the Secretary for release as an endangered species or a threatened species outside the current range of that species, when that population is wholly separate geographically from non-experimental populations of the same species. See 16 U.S.C. § 1539(j)(1). "Non-essential" is a population that is not essential to the continued existence of the species.  See id.

See id.  Specifically excluded from these restrictions are "[l]egally permitted livestock grazing and use of water sources by livestock."  See id.

In 2005, FWS adopted Standard Operating Procedures for the ENE population in the BRWRA.  See Administrative Record at AR-2466-2486.  These procedures include a policy that permits permanent removal, including live capture methods or lethal take, if a wolf commits three depredation incidents with permitted cattle within one year.  See Administrative Record at AR-02466.  On public lands, a permit must be issued for livestock owners to remove or kill wolves engaged in the act of killing or injuring livestock. See 50 C.F.R. § 17.84(k).

## STATUTORY AND REGULATORY BACKGROUND

The USFS manages the National Forest System[2] lands for multiple uses, including outdoor recreation, range, timber, watershed, and wildlife and fish, under the balance the agency deems will best meet the needs of the American public.  See Multiple Use and Sustained Yield Act of 1960 ("MUSYA"), 16 U.S.C. §§ 528-31.  The concept of multiple-use and sustained-yield were incorporated into the 1976 National Forest Management Act ("NFMA"), 16 U.S.C. § 1604(e), which governs the USFS land-management planning.  Under NFMA, forest planning and management is subject to two stages of administrative decision making:

> At the first level, the Forest Service develops the Forest Plan, a broad, programmatic document . . .  At the second level, the Forest Service implements the Forest Plan by

---

[2] The National Forest Management Act of 1976 declares that the National Forest System consists of units of federally owned forest, range and related lands throughout the United States and its territories, united into one integral system for the long-term benefit of present and future generations. The system includes: all national forest lands reserved from the United States public domain; all national forest lands acquired through purchase, exchange, donation or other means; the national grasslands and land use projects administered under Title III of the Bankhead-Jones Farm Tenant Act; other lands, waters or interests therein which are administered by the Forest Service or are designated for administration through the USFS as a part of the system. See 16 U.S.C. §§ 1600-1614.

approving (with or without modification) or disapproving particular projects . . . .
Proposed projects must be consistent with the Forest Plan and are subject to further
[NEPA] review.

Colorado Environ. Coalition v. Dombeck, 185 F.3d 1162, 1167-68 (10th Cir. 1999).

### A. **The National Environmental Policy Act**.

NEPA requires federal agencies proposing "major Federal actions significantly affecting the

quality of the human environment" to prepare a detailed statement explaining:

> (i) the environmental impact of the proposed action; (ii) any adverse environmental
> effects which cannot be avoided should the proposal be implemented; (iii)
> alternatives to the proposed action; (iv) the relationship between local short-term
> uses of man's environment and the maintenance and enhancement of long-term
> productivity; and (v) any irreversible and irretrievable commitments of resources
> which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C). "Although labeled an 'environmental' statute, NEPA is in essence a

procedural statute; it does not require agencies to elevate environmental concerns over other

appropriate considerations." Park County Resource Council, Inc. v. United States Dep't of

Agriculture, 817 F.2d 609, 620 (10th Cir. 1987).

Regulations promulgated by the Council on Environmental Quality ("CEQ"), 40 C.F.R. §§

1500-08, provide guidance on the implementation of NEPA. These regulations are entitled to

substantial deference. See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 355-56

(1989); Andrus v. Sierra Club, 442 U.S. 347, 358 (1979). CEQ's regulations permit an agency to

ensure compliance with NEPA in one of three ways. The agency may prepare an environmental

impact statement ("EIS"), which is a detailed statement subject to regulations regarding format,

content, and methodology. See 40 C.F.R. § 1502. Alternatively, the agency may prepare an

environmental assessment ("EA"). See 40 C.F.R. §§ 1501.4(b), 1508.9. The EA determines either

that there is no significant environmental impact or that an EIS is necessary. See 40 C.F.R. §§

1501.4(e), 1508.13.  Or, instead of an EA or EIS, the agency may determine that the proposed action

falls within an established "categorical exclusion" ("CE").  See 40 C.F.R. § 1508.4;  Utah Envtl.

Cong. v. Russell, 518 F.3d 817, 821 (10th Cir. 2008).

      CEs are "actions which do not individually or cumulatively have a significant effect on the

human environment and which have been found to have no such effect in [NEPA] procedures

adopted by a Federal agency."  40 C.F.R. § 1508.4.  The agency "shall provide for extraordinary

circumstances in which [the] normally excluded action may have a significant environmental

effect." Id.  Thus, an agency must determine that extraordinary circumstances do not exist before

relying on a CE in a particular instance.  See Utah Envtl. Cong. v. Russell, 518 F.3d at 742 ("[T]he

presence of an extraordinary circumstance precludes the application of a categorical approach.").

"To determine whether extraordinary circumstances exist, [an agency] must consider if the proposed

action may have a potentially significant impact on certain 'resource conditions.'"  Id. (citing Forest

Service Handbook, Ch. 30 § 30.3, at 2).

      **B.**    **The Consolidated Appropriations Act of 2005.**

      In 1995, Congress began enacting legislation based on its concern that the USFS' inability

to complete NEPA analyses on numerous expiring term grazing permits would delay renewal of

these permits to the unfair detriment of permitees.  The [Rescission] Act of 1995, P.L. 104-19 §§

501-04, 109 Stat. 194, 212 (Jul. 22, 1995), thus directs the USFS to "establish and adhere to a

schedule for the completion of [NEPA] analysis and decisions on all allotments within the National

Forest System unit for which NEPA analysis is needed."  P.L. 104-19 § 504(a), 109 Stat. at 212.

To protect the ongoing grazing program, any grazing permit which expires before completion of its

NEPA analysis pursuant to the Rescission Act schedule must be reissued "on the same terms and

conditions" as the expired permit pending NEPA compliance.  P.L. 104-19 §§ 504, 109 Stat. at 212-

13.

Congress strengthened these protections of ongoing livestock grazing with the 2003 Omnibus Appropriations Act, P.L. No. 108-7 § 328, 117 Stat. 11, 276 (Feb. 20, 2003), directing that term grazing permits issued before or during fiscal year 2003 "shall remain in effect until such time as the Secretary of Agriculture completes processing of the renewed permit in compliance with all applicable laws and regulations." Congress renewed this direction in subsequent years, most recently on March 11, 2009. See 2009 Omnibus Appropriations Act, P.L. No. 111-8 § 426, 123 Stat. 524, 729 (March 11, 2009)(extending Section 325 of the 2004 Omnibus Appropriations Act, P.L. No. 108-108 § 325, 117 Stat. 1241, 1307 (Nov. 10, 2003) through Fiscal Year 2009).

The current version of the Omnibus Act requires the terms and conditions of the permits at issue in this litigation to "remain in effect" until after processing under applicable laws. P.L. No. 108-108 § 325, 117 Stat. at 1308. This language admits of no exception.

Building on the Rescission Act and the Omnibus Acts, Congress enacted Section 339 of the Consolidated Appropriation Act of 2005, P.L. No. 108-447 § 339, 118 Stat. 2809, 3103 (Dec. 8, 2004), the provision at issue here. The federal law reads in full:

> For fiscal years 2005 through 2007, a decision made by the Secretary of Agriculture to authorize grazing on an allotment shall be categorically excluded from documentation in an environmental assessment or an environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) if: (1) the decision continues current grazing management of the allotment; (2) monitoring indicates that current grazing management is meeting, or satisfactorily moving toward, objectives in the land and resource management plan, as determined by the Secretary; and (3) the decision is consistent with agency policy concerning extraordinary circumstances. The total number of allotments that may be categorically excluded under this section may not exceed 900.

P.L. No. 108-447 § 339, 118 Stat. 2809, 3103 (Dec. 8, 2004)("Appropriations Rider"). In enacting the provision, Congress was "extremely concerned with the lack of progress the [Forest] Agency

ha[d] made in completing the environmental review of grazing allotments that are governed by the

Rescissions Act." Senate Appropriations Committee Report, S. Rep. 108-341, 108th Cong., 2d Sess.

at 54 (Sept. 14, 2004).  The Senate Appropriations Committee found that the "more prudent course

is to make the environmental review process more efficient by reducing the amount of

documentation and expense required to conduct reviews for allotments where the level of

complexity of environmental issues is negligible so that the Agency may devote its limited resources

to allotments that require a more sophisticated analysis."   Id.   During the hearings on the

Appropriation Bill, the Committee discussed its options for improving efficiency:

> SENATOR BURNS: This question may be out of line, but if you did not have to do
> a full-blown NEPA, a full-blown EIS, and operate under an EA, would that help?
> . . .
>
> MARK REY, Dept. of Agriculture: That would probably help some. The other
> alternative would be to look at formulating a categorical exclusion for at least some
> number of the grazing allotment renewals where not much is going to change on the
> ground as a consequence of the renewal anyway . . . I think an EA would help for at
> least some number of those, those 4,800 renewals that are not going to change very
> much.  A categorical exclusion would probably help a lot more, particularly if we
> were able to reinvest that money in range improvement work.

Hearings Before the Senate Subcommittee of the Committee on Appropriations, S. Hrg. 108-795,

108th Cong., 2d Sess. at 97-98 (Mar. 25, 2004).

## PROCEDURAL BACKGROUND

WildEarth Guardians brings its claims pursuant to the judicial review provisions of the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  Pursuant to Olenhouse v. Commodity

Credit Corp., 42 F.3d 1560 (10th Cir. 1994), claims under the APA are treated as appeals and

governed by reference to the Federal Rules of Appellate Procedure.  See Olenhouse v. Commodity

Credit Corp., 42 F.3d at 1580.  In keeping with Olenhouse v. Commodity Credit Corp., WildEarth

Guardians did not caption its Opening Brief as a motion for summary judgment.  See Plaintiff's

-10-

Opening Brief: Petition For Review of Agency Action at 1 (filed Jan. 12, 2009)(Doc. 55).  Its brief is consistent with the Federal Rules of Appellate Procedure, see Fed. R. App. P. 32(a)(7)(A), and the Court's January 9, 2009 Order, see Doc. 53.  Although WildEarth Guardians captioned its initial filing as a "Complaint" rather than a "Petition for Review of Agency Action," the parties subsequently agreed to proceed under Olenhouse in briefing the merits.  See Parties' Joint Motion To Set Briefing Schedule, filed May 11, 2008 (Doc. 38).

WildEarth Guardians' First Claim for Relief is for declaratory and injunctive relief reversing and remanding the 24 categorical exclusions ("CEs") that authorized continued livestock grazing on twenty-six allotments on the Gila National Forest arising from the USFS arbitrarily and capriciously abusing its authority under the Appropriations Rider to approve continued grazing on those allotments.  Their Second Claim for Relief is that the USFS failed to establish a process by which the public can appeal the issuance or renewal of grazing permits issued via a CE, in violation of the ARA and of an injunction issued by the United States Court of Appeals for the Ninth Circuit. WildEarth Guardians withdrew their second claim in its Reply in Support of Plaintiff's Opening Brief, filed May 7, 2009 (Doc. 62)("Reply"), in light of the recent United States Supreme Court holding in Summers v. Earth Island Institute, 128 S.Ct. 1142 (2009).  WildEarth Guardians' Third Claim for Relief alleges the USFS violated NEPA by not developing twenty-four EAs or EIS's for each of the twenty-six allotments.

WildEarth Guardians argues that the Court should focus on its argument that the USFS failed to satisfy the third prong of the Appropriations Rider, which requires the USFS' decision to grant or renew permits to be consistent with agency policy concerning extraordinary circumstances.  See Appropriation Rider,  P.L. No. 108-447 § 339.  WildEarth Guardians argues that the twenty-six grazing allotments, composed of 522,639 acres of land, support important habitat for no less than

five federally protected species and constitute a significant portion of the recovery zone for the endangered Mexican gray wolf, and that the administrative record does not support any of the USFS' "no extraordinary circumstances" conclusions for the Mexican gray wolf. <u>See</u> Reply at 8-9. WildEarth Guardians contends that a rule in its favor on its First Claim for Relief must necessarily result for a ruling for WildEarth Guardians on its Third Claim for Relief, because once the categorical exclusions are deemed invalid, the USFS has then implemented major federal action without any NEPA analysis, directly violating 42 U.S.C. § 4332(2)(C).

The USFS argues that grazing had been administered on the twenty-six allotments at issue for decades, and that its effects are well known and can be predicted by looking at the existing environment. <u>See</u> Federal Defendant's Response to Plaintiff's January 12, 2009 Opening Brief at 2-3, filed March 30, 2009 (Doc. 61)("USFS Response"). The USFS contends that it extensively reviewed potential environmental effects, and that WildEarth Guardians cannot establish that the USFS acted arbitrarily or capriciously in satisfying the three criteria of the Appropriations Rider. <u>See</u> USFS Response at 3.

<u>**STANDARD OF REVIEW**</u>

The parties agree that the proper standard of review for determining whether the USFS acted lawfully when it relied on the Appropriations Rider to issue twenty-four CEs for grazing permits is set forth in the APA. <u>See</u> Pl. Op. Brief at 53; USFS Response at 30. Both the Tenth Circuit and the Supreme Court have examined the scope of judicial review under the APA. <u>See</u> <u>Olenhouse v. Commodity Credit Corp.</u>, 42 F.3d at 1580; <u>Citizens to Preseve Overton Park v. Volpe</u>, 401 U.S. 402 (1971). Resolution of WildEarth Guardians's claims also require judicial review of the USFS' interpretation and application of the Appropriations Rider.

A.      **Standard of Review Under the APA.**

Because the NEPA statute does not incorporate an independent standard of review, the APA

governs the Court's review of the violations alleged.  See Utahns for Better Transp. v. United States

Dept. of Transp., 305 F.3d 1152, 1164 (10th Cir. 2002).  Pursuant to Olenhouse v. Commodity

Credit Corp., "[r]eviews of agency action in the district courts [under the APA] must be processed

as appeals. In such circumstances the district court should govern itself by referring to the Federal

Rules of Appellate Procedure."  Id. 42 F.3d at 1580.

Under the APA, a reviewing court must affirm an agency decision unless it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

In reviewing a decision under the arbitrary-and-capricious standard, the Court reviews the entire

administrative record or so much of that record as has been provided by the parties. See 5 U.S.C.

§ 706(2).  See also Colorado Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999).

The court does not pass judgment on the wisdom or merits of the agency's decision. See id. at 1172

(stating that NEPA prohibits uninformed actions, but not unwise actions).  To fulfill its function

under the arbitrary-and-capricious standard of review, however, a reviewing court should engage

in a "thorough, probing, in-depth review." Wyoming v. United States, 279 F.3d 1214, 1238 (10th

Cir. 2002)(citation omitted). The Tenth Circuit explains the relevant standard of review:

> In determining whether the agency acted in an arbitrary and capricious manner, we
> must ensure that the agency decision was based on a consideration of the relevant
> factors and examine whether there has been a clear error of judgment. We consider
> an agency decision arbitrary and capricious if the agency relied on factors which
> Congress had not intended it to consider, entirely failed to consider an important
> aspect of the problem, offered an explanation for its decision that runs counter to the
> evidence before the agency, or is so implausible that it could not be ascribed to a
> difference in view or the product of agency expertise.

Colorado Environmental Coalition v. Dombeck, 185 F.3d at 1167 (citations and internal quotations

omitted).  The standard of review requires the district court "to engage in a substantive review of the record to determine if the agency considered relevant factors and articulated a reasoned basis for its conclusions."  Olenhouse v. Commodity Credit Corp., 42 F.3rd at 1580.  While the court may not supply a reasoned basis for the agency's action not given by the agency itself, the court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freigh System, Inc., 419 U.S. 281, 286 (1974)(internal citations omitted).

When called upon to review factual determinations made by an agency as part of its NEPA process, short of a "clear error of judgment," the court asks only whether the agency took a "hard look" at information relevant to the decision.  See Citizens' Comm. to Save Our Canyons v. Krueger, 513 F.3d 1169, 1178 (10th Cir. 2008) (quotation omitted).  "In considering whether the agency took a 'hard look,' the court considers only the agency's reasoning at the time of the decision making, excluding post-hoc rationalization concocted by counsel in briefs or argument." Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d at 1165 (citing Olenhouse v. Commodity Credit Corp., 42 F.3d at 1565). "A presumption of validity attaches to the agency action and the burden of proof rests with the [party] who challenges such action." Citizens' Comm. to Save Our Canyons , 513 F.3d at 1176.

B.      **Standard of Review for Agency Interpretations of Law.**

When reviewing agency action under the APA, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the agency given the responsibility and authority to administer and give effect to a statute. See NISH v. Rumsfeld, 188 F. Supp. 2d 1321, 1324 (D.N.M. 2002)(citing Chevron U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984)).  Under the Supreme Court of the United States' decision

in <u>Chevron U.S.A. v. Natural Resources Defense Council</u>, a court determines the degree of deference afforded to an agency's interpretation under a multi-step analysis. <u>See</u> 467 U.S. at 842. First, the court must determine "whether Congress has directly spoken to the precise question at issue," <u>id.</u>, by looking to, among other things, the statutory text, history, and purpose, <u>see</u> <u>Gen. Dynamics Land Sys., Inc. v. Cline</u>, 540 U.S. 581, 600 (2004). If Congress has spoken directly to the issue, the court, as well as the agency must give effect to the "unambiguously express intent of Congress." <u>Chevron</u>, 467 U.S. at 843. If the statute is silent or ambiguous, the court then must ask "whether the agency's answer is based on a permissible construction of the statute." <u>Id.</u> While the court must not impose its own construction of the statute under inquiry, the court will not defer to an agency's construction if it is "arbitrary, capricious, or manifestly contrary to the statute." <u>Id.</u> at 843-44. <u>See</u> <u>Ctr. for Legal Advocacy v. Hammons</u>, 323 F.3d 1262, 1267 (10th Cir. 2003).

The Supreme Court clarified the scope of deference due to an agency's interpretation of a statute in <u>Christensen v. Harris County</u>, 529 U.S. 576 (2000), limiting <u>Chevron</u>-style deference to formal adjudication and notice-and-comment rulemaking. <u>See</u> 529 U.S. at 586. The Supreme Court explained that "interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law, do not warrant <u>Chevron</u>-style deference." <u>Christensen v. Harris County</u>, 529 U.S. at 586. The Supreme Court noted that interpretations contained in such formats are "entitled to respect" to the extent that they have the "power to persuade." <u>Id.</u> (citing <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944)).

The United States Court of Appeals for the Tenth Circuit has stated that "an agency's interpretation of its own regulations, including its procedural rules, is entitled to great deference," and that the court should reject an agency's interpretation only "if it is unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning." <u>Bar MK Ranches v. Yeutter</u>, 994

F.2d 735, 738 (10th Cir. 1993)(citing City of Gilette, Wyoming v. FERC, 737 F.2d 883, 884-85 (10th Cir. 1984)).

**ANALYSIS**

The Court recognizes that there is a presumption of validity that attaches to the USFS' actions as an agency, and that the burden of proof to show the USFS' actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" lies with WildEarth Guardians. Citizens' Comm. to Save Our Canyons v. Krueger, 513 F.3d at 1176. For the USFS' factual determinations to survive review under the arbitrary-and-capricious standard, however, the USFS must have "examined the relevant data and articulated a rational connection between the facts found and the decisions made." Id. The Court will consider only evidence offered in the administrative record provided to determine whether the USFS' decisions regarding the twenty-six allotments had sufficient evidentiary support. See State of New Mexico ex rel Richarson v. BLM, 565 F.3d 683, 714 (10th Cir. 2009).

**I.      THE USFS MET THE CRITERIA FOR AUTHORIZING CATEGORICAL EXCLUSIONS ON TWENTY-SIX GRAZING ALLOTMENTS IN THE GILA NATIONAL FOREST**

At its core, WildEarth Guardians' case challenges the USFS' allegedly insular and unrestrained prioritization of domestic livestock grazing, over threatened and endangered species recovery and wilderness preservation on the Gila National Forest. WildEarth Guardians challenges the application of the Appropriations Rider, P.L. 104-19 § 504(a), to twenty-six grazing allotments in the Gila National Forest. The Appropriations Rider allows the USFS to issue or renew grazing permits using a categorical exclusion to comply with NEPA, instead of an EIS or EA, provided the decision to issue or renew the permit complies with three requirements: (i) the decision continues current grazing management of the allotment; (ii) monitoring indicates that current grazing

-16-

management is meeting, or satisfactorily moving toward, objectives in the land and resource management plan, as determined by the Secretary; and (iii) the decision is consistent with agency policy concerning extraordinary circumstances.  See P.L. 104-19 § 504(a).  In its Opening Brief, WildEarth Guardians challenges the USFS on all three requirements.[3]

## A.    THE ADMINISTRATIVE RECORD DEMONSTRATES THAT THE TWENTY-SIX ALLOTMENT DECISIONS AT ISSUE CONTINUED CURRENT GRAZING MANAGEMENT.

WildEarth Guardians contend that the USFS violated the first prong of the Appropriations Rider when it authorized renewal permits using a categorical exclusion on three allotments in the Gila National Forest: Cox Canyon, Dark Canyon, and V + T.  See Opening Br. at 60.  The Region 3 Regional Office issued a letter to forest supervisors on March 11, 2005, regarding "Regional Guidance for Range Allotment Categorical Exclusion," and in this letter defined "current grazing management" under the first prong of the Appropriations Rider:

> Under provision 1, current grazing management is the current management actions being implemented over the last three to five years.  It incorporates the timing, intensity, frequency, and duration of grazing that has been implemented through existing allotment management plans and/or annual operating instructions and should reflect adaptive management flexibility that has been responsive to needed adjustments in permitted actions, based on the fluctuating precipitation patterns in the southwest.  Repair and maintenance of existing facilities is considered part of

---

[3] In its Reply, WildEarth Guardians states: "[B]ecause winning just one argument is enough for WildEarth Guardians to prevail on its First and Third Claims for Relief, this Reply focuses solely on that one, all-encompassing, win[n]ing argument: the administrative record does not support any of the USFS's 'no extraordinary circumstances' conclusions for the Mexican gray wolf."  Reply at 13.  WildEarth Guardians contends that its approach in the reply is meant to simplify the Court's resolution of WildEarth Guardians' claims and cautions the Court not to construe its approach as an abandonment of any argument asserted in WildEarth Guardians' Opening Brief supporting its First and Third Claims for Relief.  During the hearing, the USFS argued that the Court must act as an appellate court and deem the new arguments made in the Reply with respect to the Mexican gray wolf waived.  The Court finds, however, that WildEarth Guardians discussed the Mexican gray wolf and the ENE population program in its Opening Brief, and so will consider the expanded arguments in the Reply and the USFS' counter-arguments heard during the hearing on the motion.

> current management . . . For an allotment where an allotment management plan is
> not currently in place, implementation or modification of minor management
> practices, facilities, and improvements may be categorically excluded under FSH
> 1909.15.

Administrative Record at SU-00371.  WildEarth Guardians argues that the USFS violated this instruction when it granted Cox Canyon grazing over a year-long period instead of the previous six months, granted Dark Canyon a permit that did not include pasture rotation as had its previous permit, and granted V + T a permit that authorized cow and calf pairs to graze instead of yearlings, as the previous permit had.  See Opening Br. at 57-60.  WildEarth Guardians argues that these alterations violate "timing, intensity, frequency, and duration," and that the USFS violated the requirement of "current grazing management."  First and foremost, the Court recognizes that the Regional Guidance for Range Allotment Categorical Exclusion is no more than what it purports to be – guidance for the forest supervisors tasked with writing decision memoranda.  Such an internal agency document does not have the force and effect of law.  See Christensen v. Harris County, 529 U.S. at 586 (finding that interpretations of statutes in policy statements, agency manuals, and enforcement guidelines lack the force of law); Western Radio Services Co. v. Espy, 79 F.3d 896, 900-01 (9th Cir. 1996)(holding that the USFS did not act arbitrarily and capriciously by following a procedure that did not comply with the guidelines in the Forest Services Manual and Handbook). The guidelines are, however, entitled to some respect and have the "power to persuade."  Skidmore v. Swift & Co., 323 U.S. at 140.

Viewing the guidelines given on "current management conditions" in the regional guidance letter as persuasive, the Court does not see evidence that the USFS acted arbitrarily or capriciously in its decision memoranda for Cox Canyon, see COX-00422-00424, Dark Canyon, see DC-00531-00532, and V + T, see VT-00597-00598.  Rather, the decision memoranda show that the USFS

followed the guidance that the decisions "should reflect adaptive management flexibility that has

been responsive to needed adjustments in permitted actions, based on the fluctuating precipitation

patterns in the southwest." Administrative Record at SU-00371. Because WildEarth Guardians did

not challenge the review of current management on the other twenty-three allotments at issue, see

Pl. Op. Brief at 60, the Court does not find it necessary to review those sections of the

Administrative Record. Granting the USFS' decisions the deference that the law requires and

allows, the Court finds that the first prong was satisfied, and the USFS was in compliance with the

Appropriations Rider.

**B.     THE ADMINISTRATIVE RECORD DOES NOT SHOW, NOR HAS WILDEARTH GUARDIANS SHOWN, THAT CURRENT GRAZING MANAGEMENT IS NOT MEETING THE OBJECTIVES IN THE LAND AND RESOURCE PLAN**

WildEarth Guardians makes a brief argument contending that because the Gila National

Forest Plan includes the statement "maintain and/or improve habitat for threatened and endangered

species," Administrative Record at AR-01057, and has not shown monitoring data of this monitoring

and/or improvement, the second requirement of the Appropriations Rider was not met for any of the

twenty-six allotment decisions and thus none of them qualify for the categorical exclusion.

WildEarth Guardians contests that maintaining and/or improving habitat for threatened and

endangered species was one of the "objectives" that the second prong of the requirement addresses.

the USFS is quick to point out, and the Administrative Record confirms, that the statement is not

one of the "objectives" of the Gila National Forest Plan, but rather is listed as one of the "goals."

The Plan defines "objective" as "a specific statement of measurable results to be achieved within

a stated time period." See AR-01057. In contrast, a "goal" is defined as "a concise statement of

condition that a land and resource management plan is designed to achieve. A goal is usually not

-19-

quantifiable and may not have a specific date for completion." AR-01056. By its definition, the USFS could not have provided monitoring data showing that the goal of maintaining and/or improving habitat for threatened and endangered species was met.

Though WildEarth Guardians' argument on this prong was conclusory and failed to point the Court to places in the Administrative Record evidencing the USFS' failure to meet the second requirement for a categorical exclusion, the Court, to fulfill its function in this case, is required to engage in a "thorough, probing, in-depth review" of the Administrative Record. Wyoming v. United States, 279 F.3d at 1238. According to the Regional Guidance, to meet the second provision of the Appropriations Rider, the USFS decision memoranda should provide supporting data that current grazing management is meeting, or satisfactorily moving toward, objectives in the land and resource management plan. See SU-00371. The Court reviewed all twenty-four decision memos related to the twenty-six allotments at issue included in the Administrative Record, and finds that the USFS included resource narratives and discussions of monitoring data and results in the decision memoranda that demonstrate that grazing management for the allotments are meeting, or satisfactorily moving toward, objectives in the land and resource management plan for the Gila National Forest. See, e.g., WC-00417-00428; NW-00395-00406. The Administrative Record also contained extensive Range Analysis Reports with monitoring data of current range conditions, see, e.g., NW-00224-00233, and grazing monitoring data, see, e.g., WC-00222-00233. It is not the Court's place to pass judgment on the wisdom or merits of these reports, see Colorado Envtl. Coalition v. Domback, 185 F.3d at 1172, but rather to determine whether the reports evidence consideration of relevant factors and articulate reasoned bases for conclusions, see Olenhouse v. Commodity Credit Corp., 42 F.3d at 1580. The Court finds that the USFS articulated reasoned bases for finding that the twenty-six allotments met the second requirement for categorical exclusions, and

finds no evidence that the USFS was arbitrary and capricious in that determination.

**C.    THE USFS REASONABLY INTERPRETED THE EXTRAORDINARY CIRCUMSTANCES REQUIREMENT AND DID NOT ACT MANIFESTLY CONTRARY TO THE APPROPRIATIONS RIDER.**

The third criterion of the Appropriations Rider is that "the decision is consistent with agency policy concerning extraordinary circumstances." P.L. No. 108-447 § 339.  WildEarth Guardians argues that the USFS' categorical exclusion decisions failed to meet the third criterion in all twenty-six allotment decisions.

**1.    The USFS Reasonably Interpreted Congress' Language in the Appropriation Rider as an Adoption of CEQ Regulations.**

It is not the Court's role to substitute its own construction of a statutory provision for a reasonable interpretation made by the agency given the responsibility and authority to give effect to a statute.  See NISH v. Rumsfeld, 188 F. Supp. 2d at 1324 (citing Chevron U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. at 844).  Both WildEarth Guardians and the USFS interpret the language of the Appropriations Rider as purposefully tracking the language of the CEQ's regulations for implementing NEPA, 40 C.F.R. § 1508.4, which defines categorical exclusion:

> "Categorical exclusion" means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (Sec. 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in Sec. 1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

40 C.F.R. § 1508.4.  The USFS, therefore, interpreted the phrase "extraordinary circumstances" in Congress' Appropriations Rider to invoke the Forest Service's policy on extraordinary

circumstances with regard to CEs as set forth in the Forest Services Handbook.[4] FSH 1909.15,

Section 30.4 states:

> Resource conditions that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS are
>
> (1) Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species;
>
> (2) Flood plains, wetlands, or municipal watersheds;
>
> (3) Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas;
>
> (4)  Inventoried roadless areas or potential wilderness areas;
>
> (5)  Research natural areas;
>
> (6)  American Indians and Alaska Native religious or cultural sites, and
>
> (7)  Archaeological sites, or historic properties or areas.
>
> The mere presence of one or more of these resource conditions does not preclude use of a categorical exclusion (CE).  It is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions and if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions that determine whether extraordinary circumstances exist.  (36 CFR 220.6(b))
>
> When an action is to be categorically excluded from documentation in an EA or EIS, the responsible official must be able to demonstrate that the action fits within the identified category and that the potential effects on the listed resources are minor or non-existent.

FSH 1909.15, Section 30.4.  It was Congress' intent in creating the Appropriations Rider to "make

the environmental review process more efficient by reducing the amount of documentation and

expense required to conduct reviews for allotments where the level of complexity of environmental

---

[4] Indeed, the Regional Guidance letter to forest supervisors specifically advises them to refer to the list in FSH 1909.15 when assessing the third criterium of the Appropriations Rider in their CE decision memoranda.  See Administrative Record at SU-00371.

issues is negligible . . . ." S. Rep. 108-341.  Because Congress is silent as to what it considers "extraordinary circumstances," and neither the statutory text nor the legislative history, see S. Hrg. 108-795, directly define Congress' intent, the Court finds it appropriate to apply Chevron deference to the USFS' interpretation of "extraordinary circumstances," as its construction, using the CEQ and the FSH, is not arbitrary, capricious, or manifestly contrary to the statute.  See Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. at 843-44.

> **2.     The USFS Reasonably Determined That Continued Livestock Grazing on the Twenty-Six Allotments Was Consistent with the USFS' Policy on Extraordinary Circumstances**.

WildEarth Guardians contends that the USFS authorized permits to the twenty-six allotments at issue without properly examining the potential for discrete impacts or cumulative impacts on endangered or threatened species, critical habitat, designated wilderness areas, or inventoried roadless areas.  See Opening Br. at 63.  WildEarth Guardians argues that the USFS used allotment-specific biological assessments ("BAs") as its sole justification for concluding that extraordinary circumstances do not exist.  See id. at 64.  WildEarth Guardians maintains that relying on BAs is insufficient because they are not the "functional equivalent" of compliance with NEPA in that (i) there is no public participation; (ii) BAs consider only discrete – not cumulative – impacts; and (iii) BAs cannot lead to a positive extraordinary finding for experimental non-essential endangered species, like the Mexican gray wolf.  WildEarth Guardians concedes in its Reply, however, that the USFS may properly use information contained in a BA to inform a categorical exclusion decision.  See  Reply at 17.  WildEarth Guardians also argues that the reason that the USFS' analysis is insufficient is because the USFS focused on the wrong things. WildEarth Guardians contends that, whereas the USFS reported on effects on resources such as watersheds, soils, reparian areas, and range conditions, the Mexican gray wolves are affected by grazing because

it means more wolves are being killed in response to the wolves eating the cattle, which the reports do not address.  See Reply at 23.

The USFS responds that WildEarth Guardians' argument that it attempted to use the BAs as a functional equivalent to NEPA compliance procedures is misplaced.  The USFS argues that it was not using the BAs as a substitute for NEPA compliance, but rather used the analyses in the BAs along with many other reports to help assess whether there are extraordinary circumstances, and thus the issue of functional equivalency is irrelevant.  After reviewing the Administrative Record, the Court agrees that the references in the CE decision memoramda to the BAs are not being cited to replace the NEPA compliance requirement.  Indeed, that the USFS went through the analyses in the twenty-four decision memoranda, and through the three criteria in the Appropriations Rider as part of their CEs, negates the functional equivalency argument and does not support a finding that USFS acted arbitrarily and capriciously in referencing the BAs in their CEs.

The Court reviewed the twenty-four decision memoranda related to the twenty-six allotments and sees no evidence that the USFS acted arbitrarily, capriciously, or manifestly contrary to the requirements of the third criterium of the Appropriations Rider.  Rather,  the USFS was acting with Congress' intentions in mind when it cited to other reports and monitoring data as support for its analysis in the "extraordinary circumstances" assessment in each decision memorandum.  The reason for the Appropriations Rider was to speed up the process of NEPA compliance, and part of the sought efficiency, was to reduce the amount of duplicative assessment required.  See  S. Rep. 108-341.  Again, the Court emphasizes that it is not its role to pass judgment on the wisdom or merits of these reports, see Colorado Envtl. Coalition v. Domback, 185 F.3d at 1172, but rather to determine whether the reports evidence consideration of relevant factors and articulate reasoned bases for conclusions, see Olenhouse v. Commodity Credit Corp., 42 F.3d at 1580.  The decision

memoranda address relevant factors and provide what appear to be reasoned conclusions.  There appears from the Administrative Record to be sufficient attention paid both to specific resources and cumulative effects.  The Court agrees with the USFS that assessment of the current conditions of the whole landscape in the wildlife reports based on all activities in the area is sufficiently representative of cumulative impacts to be expected from continued livestock grazing on the allotments.

Many of the memoranda and other reports Administrative Record for the allotments also contained specific statements about the impact on certain species, including the Mexican spotted owl, see, e.g., TR-00504, the Chiricahua leopard frog, see, e.g., SA-00177, the spikedace, and the loach minnow, see, e.g., SA-00180-00182.  Many of these statements are in conjunction with reports that the FWS prepared and the monitoring that the FWS has done.  The Court finds nothing that proscribes USFS and FWS from pooling their monitoring resources in the assessment of environmental impact analyses.

WildEarth Guardians takes specific issue with the threat of grazing poses on the Mexican gray wolf.  It argues that, because the Standing Operating Procedures in the BRWRA wolf re-introduction project permit the removal or killing of wolves that kill livestock, there are extraordinary circumstances present and thus the CEs are not permissible.  WildEarth Guardians has not directly challenged the Standard Operating Procedures ("SOP") of the wolf re-introduction project in the BRWRA.  WildEarth Guardians has brought suit against the FWS and the USFS challenging the operating procedures in the United States District Court for the District of Arizona, specifically SOP-13, which relates to the criteria for determining the status of nuisance and problem wolves and whether or not those wolves should be removed or killed.  See WildEarth Guardians v. United States Fish and Wildlife Service, CV 08-820 (D. Ariz. 2009). The District of Arizona denied

FWS' motion to dismiss the claims for lack of jurisdiction, determining the SOP to be final agency action under the APA and reviewable by the court; however, the court dismissed the claims relying on APA § 706(1) and § 1540(g)(1)(C).  See WildEarth Guardians v. United States Fish and Wildlife Service, 607 F. Supp. 2d 1095, 1118 (D. Ariz. 2009). The Arizona court has not yet addressed WildEarth Guardians' claims  against the USFS for failing to act to promote conservation of the Mexican gray wolf, which are based on allegations that, among other things, the USFS failed to include a conservation provision in its grazing permits.   See 607 F. Supp. 2d at 1119 n.15. WildEarth Guardians has not challenged SOP-13 before this Court, nor has it brought a claim that the USFS unlawfully withheld or unreasonably delayed agency action by failing to carry out conservation of the Mexican gray wolf, and thus the Court need not decide issues that WildEarth Guardians prefers to be decided in the District of Arizona.  While the District of Arizona may ultimately find that the USFS failed to act to conserve the Mexican gray wolf, it does not affect the outcome that the USFS acted reasonably when it issued the CEs.

  The USFS' CE reports address the re-introduction project as well as the presence of wolves in a given allotment to assess whether the wolves are occasionally or regularly setting up dens, rendezvous sites, or territories within the given allotment.  See, e.g., TR-00505.  The Court does not see evidence in the Administrative Record that USFS merely "rubber-stamped" findings that grazing on each allotment would not wipe out the Mexican gray wolf.  Instead, the Court sees that USFS incorporated FWS' findings that grazing is not likely to jeopardize the continued existence of the wolf alongside its own observations of the wolves on any given allotment.

  Guardian also raised concerns about public comment not being permitted when USFS uses a categorical exclusion to meet NEPA compliance.  The Court notes, however, that USFS conducted

scoping analysis as part of each of its assessments.[5]  While WildEarth Guardians may be disgruntled that the USFS did not change their assessments based on the comments WildEarth Guardians submitted, that is not enough for the Court to find that the twenty-four decision memos in the Administrative Record were arbitrary and capricious.

## II.  WILDEARTH GUARDIANS IS NOT ENTITLED TO JUDGMENT ON ITS THIRD CLAIM FOR RELIEF.

WildEarth Guardians argues that, because USFS did not meet the three criteria for CEs under the Appropriations Rider, it violated NEPA by not preparing EIS's or EAs of the twenty-six allotments.  The USFS argues that WildEarth Guardians' argument is misplaced, because it seeks a substantive decision on a procedural question.

It is not the place of the Court to judge the decision of the USFS to use CEs instead of EIS or EAs.  See Casias v. Sec'y of Health and Human Servs., 933 F.2d 799, 800 (10th Cir. 1991) ("In evaluating the appeal, we neither reweigh the evidence nor substitute our judgment for that of the agency.").  It is the Court's role to determine whether the CEs were supported by reasonable facts and conclusions.  The Tenth Circuit has held that: "If the record before the agency does not support the agency action, if the agency has not considered all the relevant favors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstance, is to remand to the agency for additional investigation or explanation."  Middle Rio Grande Conservancy Dist. v. Norton, 294 F.3d 1220, 1226 (10th Cir.

---

[5] Scoping is the process by which the USFS receives public comment on the planning of allotments.  The USFS sends out a solicitation for comments along with a Proposed Action report for the allotment.  See, e.g., VT-00103-00118.  The Regional Guidance letter states: "Scoping and plan-to-project analysis is required for all actions categorically excluded from documentation in an EA or EIS. The responsible official will determine the appropriate level of scoping in the context of existing direction."  Administrative Record at SU-00372.

2002).  Though the Court finds that reasonable facts and conclusions in the Administrative Record

support the USFS' decisions regarding the twenty-six allotments, if the Court had not reached that

conclusion, the appropriate remedy would be to remand the decisions back to USFS, not to grant

injunctive relief, as WildEarth Guardians' third claim for relief requests. See id.

       **IT IS ORDERED** that the Plaintiff's Petition for Review of Agency Action is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Melissa Hailey
WildEarth Guardians
Santa Fe, New Mexico

-- and --

James Tutchton
WildEarth Guardians
Denver, Colorado

     *Attorneys for the Plaintiff*

Jan Elizabeth Mitchell
  Assistant United States Attorney
Albuquerque, New Mexico

-- and --

Andrew A. Smith
  Trial Attorney
Natural Resources Section
Environment and Natural Resources Division
United States Department of Justice
Albuquerque, New Mexico

     *Attorneys for the Defendant*

Karen Budd-Falen

Kathryn Brack Morrow
Brandon L. Jensen
Budd-Falen Law Offices, LLC
Cheyenne, Wyoming

*Attorneys for the Defendant-Intervenors*